**Lizzie E. WILLIAMS, and Children on Behalf of Luther WILLIAMS, Deceased, Plaintiffs,**

v.

**JACKSON STONE COMPANY, et al., Defendants.**

**Civ. A. No. 3:92–CV 86(L).**

United States District Court, S.D. Mississippi, Jackson Division.

Aug. 5, 1994.

**456**

Firnist J. Alexander, Jr., and Gail Wright Lowery, Lowery & Castilla, Jackson, MS, for plaintiffs.

Mark C. Carlson, McCoy, Wilkins, Stephens & Tipton, Walter J. Brand, George R. Fair, Watkins & Eager, and Robert C. Boyd, Boyd & Akin, Jackson, MS, for Jackson Stone Co.

Paul V. Ott, Daniel, Coker, Horton & Bell and Kenna L. Mansfield, Jr., Wells, Wells, Marble & Hurst, Jackson, MS, for defendants.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the separate motions of defendants Jackson Stone Company (Jackson Stone) and Home Life Insurance Company (Home Life) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs Lizzie Williams and children, on their own behalf and on behalf of Luther Williams, deceased, have filed a response and the court, having considered the parties' memoranda of authorities, together with attachments,[1] concludes that the motion of Home Life should be granted and the motion of Jackson Stone should be denied.

Luther Williams was employed by Jackson Stone from 1967 to 1981. During this period, Jackson Stone provided its employees group medical, disability and life insurance coverage through a policy with Home Life. Luther Williams was a covered beneficiary under this policy and had designated his wife, Lisa Etta (Lizzie) Williams, as his life insurance beneficiary. In February 1981, Luther Williams was diagnosed with Alzheimer's disease, which rendered him unable to work. His employment with Jackson Stone was subsequently terminated on approximately June 30, 1981. He passed away in January 1991, and shortly thereafter, on March 22, 1991, Lizzie Williams secured claim forms from Jackson Stone and submitted a claim for life insurance benefits to Home Life. By letter dated June 7, 1991, Home Life denied the claim on the basis that Mr. Williams' coverage under the policy had ceased upon the termination of his employment, and that he, therefore, was not covered by the policy at the time of his death.

On January 14, 1993, plaintiffs filed this action *pro se* in the Circuit Court of Hinds County, Mississippi, alleging that defendants had fraudulently denied payment of insurance benefits under the Home Life policy and seeking to recover "hospital, medical, nursing home, disability insurance, and life insurance" benefits alleged to have been wrongly denied by defendants. Plaintiffs further sought damages for their alleged emotional distress.[2] Defendants timely re-

---

1. The court previously issued an opinion in this matter granting defendants' motions for summary judgment. Plaintiffs thereafter moved for reconsideration and the court, by order dated May 17, 1994, granted plaintiffs' request and vacated its earlier opinion. Plaintiffs were permitted to file an amended response to defendants' motions for summary judgment and defendants were given the opportunity to file appropriate rebuttals. The briefing having been completed, the court may now reevaluate defendants' motions for summary judgment.

2. The substantive allegations of their complaint were set forth in two paragraphs, as follows:

We the family of the late Luther Williams, make use of said mentioned above Defendant Jackson Stone Co. and Home Life Insurance, for fraudulent denied of said deceased Luther Williams' medical and life insurance benefits which caused an undue state of said deceased plaintiff and family members deep under poverty level condition, mental stress, pain and suffering; causing poor health and medical care to the deceased and a financial undue

moved the case on the basis that plaintiffs' putative state claims were preempted by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002 *et seq.*

In their motion for summary judgment, defendants contend that plaintiffs' claims are preempted by ERISA and that, on the facts of record, plaintiffs have no grounds for recovery under ERISA, or under the terms of Home Life's policy. Home Life argues, more specifically, that plaintiffs are precluded from recovering plan benefits since neither Mr. Williams, nor anyone on his behalf, complied with policy provisions for extending or converting coverage following the termination of his employment. In its motion, Jackson Stone asserts that it can have no liability for plan benefits since it was merely Mr. Williams' employer and not the insurer, and that consequently, it is not a proper defendant in this suit.

 The court would agree that summary judgment was in order if plaintiffs' position in this action was simply that defendants wrongly declined to pay benefits claimed to be due and owing under the terms of the plan.[3] Only full-time employees were eligible for coverage under Home Life's policy, which declared that the coverage there-

under would terminate automatically on "the date employment terminates, the date the employee ceases to be in a class eligible for coverage, or on the last day of the period for which the employee makes a premium contribution." The plan did provide a conversion privilege for employees whose health and life coverage ended because their employment was terminated, and further provided for an extension of life insurance during a period of total disability without the requirement of premium payments. However, it is undisputed that Luther Williams did not, either before or after the termination of his employment in June 1981, take the steps required to convert his health coverage or to extend his life insurance coverage.[4] The policy also included a disability benefit payable during periods of total disability upon the employee's furnishing due proof of disability. Mr. Williams, though, did not file a claim for disability coverage. Having failed to take the necessary steps to secure disability payments, or to convert or extend his life and health coverage following his termination, Mr. Williams was entitled to no further health, disability or life insurance benefits in accordance with the terms of the plan. Plaintiffs, therefore, may not recover plan benefits.[5] However, that does not necessari-

---

strain to wife and children, in baring the cost and suffering of the deceased.

We the family seek $3,006,000 for unpaid hospital medical, nursing home, disability insurance, and life insurance that was fraudulent denied by Jackson Stone Co., and Home Life Insurance over a period of 10 years, in which the deceased suffered from the date of disability, leaving the work-place of Jackson Stone Co., until Death 1–12–91, in which said deceased had paid for such insurance by payroll deduction to said mentioned Home Life Insurance Co.

**3.** Indeed, at a time when the court misperceived this to be plaintiffs' position, it granted summary judgment for defendants and ordered dismissal of plaintiffs' complaint. It has since been made clear that there is more to plaintiffs' claim.

**4.** Home Life required that an employee, in order to secure conversion of his health and life coverage, submit an application and pay a premium for a converted policy within 31 days of termination of employment. An employee could continue his life insurance during a period of total disability without the payment of premiums if he provided proof of continuing disability to Home Life each year of his disability.

**5.** Plaintiffs argue that Home Life waived any right to assert Mr. Williams' failure to adhere to these policy requirements as a basis for refusing payment since Home Life knew or should have known of his disability. They maintain that since Home life received and paid a claim for medical expenses associated with the January 1981 hospitalization during which Mr. Williams was diagnosed with Alzheimer's disease, then Home Life thereby became aware of Mr. Williams' disability. They then reason that because Home Life knew or should have known of his disability, it thus waived all other policy provisions regarding conversion, and notice and proof of Mr. Williams' disability. Plaintiffs have cited no authority for this position, and the court finds that their argument lacks merit as a matter of fact and law. There is no proof that Home Life was aware of the extent of Mr. Williams' illness, and even if there were such proof, it does not follow that merely by acquiring such knowledge, Home Life somehow waived the express provisions of its insurance policy. Waiver is by definition "the intentional or voluntary relinquishment of a known right," *Black's Law Dictionary,* 6th Ed. p. 1580 (1990), and there is absolutely no indication that Home Life surrendered any of its rights under the policy.

ly mean that they are foreclosed from recovery in this action, for plaintiffs contend that Mr. Williams' failure to take such actions as were required for securing disability payments or for converting and/or extending his health and life coverage was caused by a false representation by a Jackson Stone employee, Dan Gill, to the effect that Mr. Williams had no coverage available to him under the policy.

### JACKSON STONE [6]

In her deposition, Mrs. Williams explained that in early 1981, upon learning that her husband had Alzheimer's disease and would no longer be able to work, she contacted Jackson Stone and spoke with Dan Gill. According to Mrs. Williams, when she advised Gill that Mr. Williams' doctor had said that her husband would no longer be able to work, Gill asked that she furnish a statement from the doctor confirming this information, which she did. Mrs. Williams related that she expressly asked Gill at or about that time whether there were "any kind of benefits that [were] due," or that "[her] husband could get." Gill, she states, told her no. He told her only that she would be receiving a life insurance policy in the mail that would be "paid up for life," and advised her to put that policy in a safe place so that she would have insurance when Mr. Williams died. He never told her, though, that her husband had disability coverage, or that he had a right upon termination of his employment to convert his medical coverage to an individual policy, nor did he mention that the life insurance coverage he had referenced would be paid up for life only if she complied with

certain conditions. To the contrary, according to Mrs. Williams, he led her to believe that the life insurance was "paid up for life" without any action on her part,[7] and explicitly misrepresented the true facts of her husband's available coverages under the plan.[8]

Mrs. Williams explained that after these conversations with Gill in early 1981, she had no further communication with Jackson Stone or with Home Life about her husband's coverage because,

> I wouldn't have had no reason to call, you know, to talk to nobody because they told me when he come out of the hospital that his insurance was—he couldn't use it no longer ... So it wasn't no reason for me to, you know, get in contact with them for nothing until he died.... [L]ike I said, Mr. Gill told me that it wasn't anything, you know, for to be gotten. So I wouldn't have no reason to keep worrying them....

And though she acknowledged that she and her husband did not continue paying premiums for his insurance coverage, she stated:

> We couldn't pay no premium because, like I'm saying, Jackson Stone was the one that set up everything. Only thing I could do was go by what Mr. Gill told me, that it wasn't anything and that the policy that I would get through the mail would be paid up for life. And that's all I had to hold on to was the insurance policy that—his life insurance.[9]

Plaintiffs submit that in failing to convey accurate information concerning Mr. Williams' insurance coverage, Jackson Stone breached its fiduciary duty and is liable to respond in damages equivalent to those bene-

---

6. Although some common issues are raised by defendants, since some different issues are presented regarding the potential liability of the respective defendants, the court addresses their motions separately.

7. Coincidentally, within a few weeks after her conversation with Gill, Mrs. Williams did receive a life insurance policy from an American States Insurance Company, which she assumed was the policy to which Gill had referred. So she put it in a safe place, as he had instructed, and presented it to the funeral home when Mr. Williams died. She was told, however, that the policy was "no good." She then turned to Jackson Stone, who advised her that the company knew nothing

about that insurer and had never offered that coverage.

8. The court would observe that Jackson Stone denies plaintiffs' allegations, but has offered no contrary proof.

9. The court notes that it appears from the record that after Mr. Williams' diagnosis with Alzheimer's disease in January 1981, he never again spoke with or communicated in any form with anyone at Jackson Stone, nor did he communicate with Home Life. Mrs. Williams indicated that she was the one who spoke with Gill, not her husband, because by that time, Mr. Williams was "already sick."

fits which would have been payable under the policy had Mr. Williams converted and extended his coverages, together with damages for emotional distress.

■■■ Defendants argue initially that plaintiffs' complaint must be dismissed since ERISA governs this action and plaintiffs have alleged only state law claims. It seems clear that the group insurance plan in question is an employee welfare benefit plan covered under ERISA.[10] It appears equally clear that plaintiffs' claims are preempted by ERISA. ERISA's preemption provision, 29 U.S.C. § 1441, is extremely broad, extending to "any and all state laws insofar as they may now or hereafter *relate to* any employee benefit plan" covered by ERISA. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) (emphasis added). *See also Lee v. E.I. DuPont de Nemours & Co.,* 894 F.2d 755 (5th Cir.1990) (even state laws only indirectly affecting employee benefit plans may be preempted by ERISA); *Goodman v. S & A Restaurant Corp.,* 756 F.Supp. 966, 968 (S.D.Miss.1990) ("Congress intended that the field of employee benefit plans be regulated exclusively by federal law") (citing *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236 (5th Cir.1990)). As the Court explained in *Shaw,* ERISA preemption encompasses any state law that has a "connection with or reference to" an employee benefit plan. *Shaw,* 463 U.S. at 97, 103 S.Ct. at 2900. In the case at bar, plaintiffs' state law claim has "a connection with or reference to" Jackson Stone's employee benefit plan since the damages

plaintiffs seek, at least in part, consist of life, health and disability benefits that would have been payable under the Home Life policy but for Gill's alleged breach. A determination of the total amount of any such damages would necessitate reference to the policy. *See Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1294 (5th Cir.1989) (state law claim preempted since damages would consist of pension benefits to have been received but for alleged breach); *Haggard v. Armstrong Rubber Co.,* 767 F.Supp. 119 (M.D.La.1991) (claim preempted since computation of damages would require reference to plan); *see also Christopher v. Mobil Oil Corp.,* 950 F.2d 1209, 1220 (5th Cir.1992) (state law fraud claim preempted due to its link to ERISA plan); *Lee v. E.I. DuPont de Nemours & Co.,* 894 F.2d 755, 757 (5th Cir.1990) (state law fraud and misrepresentation claims, in addition to contractual claims, preempted). Contrary to defendants' position, however, the fact that plaintiffs have alleged only state law claims does not necessarily require that the court dismiss their complaint. Rather, once the court concludes that the claims are preempted, the court is to recharacterize them as claims arising under ERISA. *Degan v. Ford Motor Co.,* 869 F.2d 889, 893 (5th Cir.1989) (preemptive effect of ERISA effectively recharacterizes state law claims into actions arising under federal law); *see also Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (same).

■■ Jackson Stone argues that, as a matter of law, plaintiffs have no claim against it

**10.** Plaintiffs, in fact, have admitted that the plan is covered by ERISA. Even without their admission, however, the court would conclude that the plan is an ERISA employee welfare benefit plan. *See* 29 U.S.C. § 1132. Whether a particular plan qualifies as an employee welfare benefit plan under ERISA depends on "whether a plan (1) exists; (2) falls within the safe harbour provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer or intending to benefit employees." *Meredith v. Time Ins. Co.,* 980 F.2d 352, 355 (5th Cir.1993). To resolve whether a plan exists, the court must "determine whether from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Dono-*

*van v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (quoted in *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236 (5th Cir. 1990)). Here, a plan clearly exists. The intended benefits are set forth in the policy; the class of beneficiaries consists of Jackson Stone employees and their dependents; the premiums were funded in part by Jackson Stone with the remainder being paid through payroll deductions; and a procedure was in place for filing claims. The plan also satisfies the primary elements of an ERISA "employee benefit plan" in that it was established by Jackson Stone for the purpose of providing medical, accident, disability and death benefits to its employees. 29 U.S.C. § 1002(1). Finally, the plan falls within the Department of Labor's safe harbour provision, 29 C.F.R. § 2510.3–1(j).

under ERISA for breach of a fiduciary duty since ERISA does not grant participants and/or beneficiaries a private right of action for compensatory relief based on an alleged breach of fiduciary duty.[11] In other words, it contends that plaintiffs' state law claim cannot be recharacterized and found viable under ERISA since ERISA does not recognize such a cause of action. In the court's opinion, this argument lacks merit.

ERISA's civil enforcement provision, 29 U.S.C. § 1132, provides as follows:

A civil action may be brought—

(1) by a participant or beneficiary—

. . . . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan.

Section 1109, to which subsection (2) refers, addresses liability for breach of fiduciary duty, and provides that,

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary, which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Jackson Stone argues that plaintiffs' claim for breach of fiduciary duty is not among those authorized by § 1132(a)(2) or (3), and that it must therefore be dismissed. As support for its position, Jackson Stone relies on *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), in which the Court held that an individual plan participant or beneficiary may not file suit for damages for breach of fiduciary duty under § 1109 or § 1132(a)(2). The Court concluded that any recovery under that section inures to the benefit of the plan as a whole, not to the benefit of the participant or beneficiary asserting the claim, *Russell,* 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985), and explained that in adopting § 1109, ERISA's draftsmen were concerned not with protecting the rights of the individual participant or beneficiary, but were instead "primarily concerned with the possible misuse of plan assets, and with remedies which would protect the entire plan." *Id.* at 141, 105 S.Ct. at 3090. The Court was "persuade[d] that Congress did not intend that section to authorize any relief except to the plan itself." *Id.* at 144, 105 S.Ct. at 3091.

Jackson Stone submits that plaintiffs' claim for breach of fiduciary duty runs afoul of *Russell,* as plaintiffs obviously seek individual relief for their own personal benefit rather than for the benefit of the plan, and that consequently, their claim must be dismissed. In the court's opinion, however, while *Russell* does compel the conclusion that plaintiffs may not maintain this action under § 1132(a)(2), *Russell* is not dispositive on the question of the viability of plaintiffs' claim.

In *Corcoran v. United Healthcare, Inc.,* 965 F.2d 1321, 1335 (5th Cir.1992), the Fifth Circuit observed that while the *Russell* Court had held that extracontractual damages were not available under § 1109(a) or § 1132(a)(2), the Court's consideration had been confined to whether the damages the plaintiff had sought could be recovered under those particular provisions; the Court had no occasion

---

**11.** The principal argument advanced by Jackson Stone in support of its motion for summary judgment is that it cannot be liable for benefits under the plan since it is not the insurer, but rather was merely the employer. Inasmuch as the court has concluded that plaintiffs are not entitled to recover plan benefits *per se,* the court finds it unnecessary to reach this argument.

to consider whether the damages requested were available under § 1132(a)(3), which provides a cause of action for plan participants or beneficiaries seeking "other appropriate equitable relief" to redress violations of ERISA. *Corcoran*, 965 F.2d at 1335. The *Corcoran* court recognized that "a plan beneficiary certainly may sue under § 502(a)(3) for a breach of the fiduciary duties set forth in [29 U.S.C. § 1104]." [12] The issue, though, was whether § 1132(a)(3) permitted recovery of compensatory damages for such a breach. While the court did not definitively decide that issue, concluding only that the damages therein sought for emotional distress and mental anguish were not recoverable, it suggested implicitly that some types of compensatory damages are available for a breach of fiduciary duties under the category of "other appropriate equitable relief." The court stated:

> "The characterization of equitable relief as encompassing damages necessary to make the plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation.... Trusts allow for monetary damages as make-whole relief, providing that a beneficiary has "the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust" or "of pursuing a remedy which will put him in the position he would have been if the trustee had not committed the breach of trust."

*Corcoran*, 965 F.2d at 1336 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–11, 109 S.Ct. 948, 954–55, 103 L.Ed.2d 80 (1989) (Brennan, J., concurring)).

In this case, as in *Corcoran*, plaintiffs may not recover damages for their emotional distress for Jackson Stone's alleged breach of fiduciary duty. However, in the court's opinion, to the extent that they seek damages consisting of the benefits to which they would have been entitled "if [Jackson Stone] had not committed the breach of trust," *Corcoran*, 965 F.2d at 1336, § 1132(a)(3) provides a basis for recovery.[13] *See Christopher v. Mobil Oil Corp.*, 149 F.R.D. 539, 549 (E.D.Tex. 1993) ("While certainly damages for emotional distress and punitive damages would not be available to Plaintiffs [alleging claim for breach of fiduciary duty under § 1132(a)(3) ], other 'make-whole' relief is apparently available according to *Corcoran*."); *Lawrence v. Jackson Mack Sales, Inc.*, 837 F.Supp. 771, 789 (S.D.Miss.1992) (recovery of such extra-contractual damage as would be available under law of trusts to place plaintiff in position she occupied prior to alleged fiduciary breaches recoverable under § 1132(a)(3)). The court thus rejects Jackson Stone's contention that ERISA provides no means of monetary redress for the benefit of individual plan participants or beneficiaries for breaches of fiduciary obligations respecting their ERISA plans. There remain, however, the questions of whether plaintiffs have presented sufficient evidence of Jackson Stone's status as a fiduciary with respect to the plan to withstand Jackson Stone's motion, and if so, whether the evidence they have presented creates a question of fact on the issue of breach of its duties as a fiduciary.

■ Jackson Stone denies plaintiffs' contention that it is a "fiduciary" within the meaning of ERISA with respect to any part of the plan at issue, and submits that there is

---

**12.** Section 1104 provides, in pertinent part, as follows:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
 (A) for the exclusive purpose of:
 (i) providing benefits to participants and beneficiaries; ...
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.

**13.** Defendants argue that plaintiffs have no arguable claim for damages relating to the health coverage since Mrs. Williams admitted in her deposition testimony that she did not incur any hospitalization expenses after Mr. Williams ceased his employment with Jackson Stone. However, Mrs. Williams testified that she did incur medical expenses in the form of charges for doctors' services and defendants have not shown that such expenses were not covered by the Home Life group policy or that they would not have been covered by a converted individual policy.

"no evidence whatsoever" in the record which supports plaintiffs' contention. ERISA defines the term "fiduciary" to include "a person (i) [who] exercises any discretionary authority or discretionary control respecting management of such plan ... or (ii) ... has any discretionary authority or discretionary responsibility in the administration of such plan." Here, whereas Jackson Stone has presented no evidence concerning its relationship to the plan, Mrs. Williams has testified at length concerning Jackson Stone's role in the administration of its ERISA plan. And according to Mrs. Williams, from the perspective of its employees, Jackson Stone was heavily involved in administering the plan. She stated that she could not submit claims to Home Life for payment, but rather was required to go through Jackson Stone. She explained,

"[E]verything that's done for employees have to come through Jackson Stone. They can't file a claim on their own. Jackson Stone have to file it; and if Jackson Stone don't file it, they don't get anything.... That's the way they got it set up. My husband couldn't file a claim. He couldn't file a claim to Home Life Insurance. Jackson Stone would have to do it.... [T]hat's the way it was. Even a doctor bill, it had to be sent to Jackson Stone. They had to pay it.... Jackson Stone was the one that set up everything."

Mrs. Williams' testimony in this regard is uncontroverted and, in the court's opinion, would be sufficient without more to establish Jackson Stone as a plan fiduciary. There is further evidence, though, which also suggests this conclusion. The plan is not particularly illuminating as to Jackson Stone's status with reference to the various aspects of plan administration. But it does specifically direct that Jackson Stone be consulted by participants for information concerning their rights and entitlement to benefits upon termination of their employment.[14] Considering this fact, together with Mrs. Williams' testimony, the

court concludes that Jackson Stone's argument that it is entitled to summary judgment because of the absence of proof of its status as a fiduciary is without merit.

■ Manifestly, the conduct charged by plaintiffs, i.e., that Jackson Stone provided false and misleading information to Mrs. Williams concerning the availability of coverage for Mr. Williams, would amount to a breach of Jackson Stone's duty as a fiduciary. *See Drennan v. General Motors Corp.,* 977 F.2d 246, 251 (6th Cir.1992) ("A fiduciary must give complete and accurate information in response to a participant's questions...."); 29 U.S.C. § 1104(a). Jackson Stone argues, though, that even if plaintiffs' allegations about Gill's misrepresentations are accepted as true, plaintiffs still cannot prevail because they are estopped to deny knowledge of the provisions of Home Life's policy, including those provisions delineating a participant's right to convert or extend coverage. Mrs. Williams testified that she had received a plan booklet describing the provisions of Home Life's policy and in fact produced such a document at her deposition.[15] Jackson Stone submits that because this information was made available to them, Mr. and Mrs. Williams should have been aware of the proper steps for filing a claim for disability benefits, and for converting their health coverage and extending Mr. Williams' life insurance coverage. It contends, therefore, that plaintiffs "cannot credibly deny knowledge of the contents of the insurance booklet, or maintain that the extent of their knowledge and understanding of the policy was required to come from Jackson Stone." In the court's opinion, however, the language of the plan significantly undermines Jackson Stone's position.

Under the heading "Termination of Employee Insurance," the plan states, in relevant part:

14. This provision is discussed further, *infra* at p. 462–463.

15. Mrs. Williams admitted in her deposition that from time to time, her husband brought home insurance booklets from work and she produced

a small booklet which she identified as being the type of booklet that her husband received from Jackson Stone. Luther Williams, her son, identified that particular booklet produced by his mother as the document he had found in his parents' home after his father's death.

Your insurance under a Coverage will automatically terminate on the earliest of these dates:

—the date your employment terminates. (Your employment terminates when you cease active, full-time work—unless the Policy provides otherwise. *If you cease work for any reason, consult your employer immediately to determine what benefits or rights, if any, may be available to you under the Policy.*) (emphasis added).

Plaintiff has presented evidence, which at this time is unrefuted, that as soon as she learned that her husband would no longer be able to work, she immediately consulted Jackson Stone to determine what benefits or rights, if any, may have been available to Mr. Williams under the policy. Given that she did precisely what was contemplated and specifically directed by the policy, Mrs. Williams may indeed "credibly . . . maintain that the extent of [her] knowledge and understanding of the policy was required to come from Jackson Stone." Further, because the policy conferred upon Jackson Stone the duty to advise participants of their available "benefits or rights, if any" upon termination of employment, Jackson Stone can hardly reasonably contend that upon Mrs. Williams' explicit inquiry, *as directed by the policy*, it was not obligated to provide her with accurate information concerning the "benefits and rights" that "may [have been] available" to Mr. Williams under the policy.[16] Its failure to do so, if proven, would constitute a breach of its fiduciary duty for which damages may lie.[17]

■ ERISA provides the applicable statute of limitations for any "action . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation" under the provisions governing fiduciaries, as being the earlier of:

(1) six years after (A) the date of the last action which constituted a part of the breach of violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach of violation, or

(2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach of violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach of violation was filed with the Secretary under this title;

except that in the case of fraud or concealment, such action may be commenced not

---

16. Jackson Stone contends that the representations claimed by plaintiff to have been false and misleading were not false at all at the time they were made in February 1981 since Mr. Williams was not entitled to convert or extend his coverages until such time as he was terminated, and since his employment was not actually terminated until June 1981. However, while Mr. Williams may have remained an employee on the company's records until June 1981, it would appear under the terms of the policy that for purposes of his insurance coverages, his employment terminated in January 1981. Again, the policy states that an employee's employment terminates when he "cease[s] active full-time work." It is undisputed that Mr. Williams never returned to work after January 1981 and thus that he "cease[d] active full-time work" in January 1981.

17. The facts of this case bring to mind those cases in this circuit which have held that oral modifications to an employee benefit plan governed by ERISA cannot form a basis for a breach of contract claim, and that claims of promissory or equitable estoppel based on such oral modifications are not actionable under ERISA. *See*

*Williams v. Bridgestone/Firestone, Inc.*, 954 F.2d 1070, 1072 (5th Cir.1992); *Rodrigue v. Western & Southern Life Ins. Co.*, 948 F.2d 969 (5th Cir. 1991); *Degan v. Ford Motor Co.*, 869 F.2d 889 (5th Cir.1989); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290 (5th Cir.1989). In the court's opinion, that line of cases is not applicable here. In each of those cases, unlike this one, the employee sought benefits which had been orally promised when, in fact, the terms of the written plan did not provide for such benefits. The Fifth Circuit has explained that to allow causes of actions based on such modifications would be inconsistent with ERISA's writing requirement, which is intended to "protect[ ] the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan." *Rodrigue*, 948 F.2d at 971 (citing *Cefalu*, 871 F.2d at 1296) (written instrument clause designed to prevent collusive or fraudulent side agreements between employers and employees which might threaten stability and solvency of plan). Moreover, there is nothing in any of those cases to indicate that the plans under scrutiny actually directed the employees to ask their employer or insurer about their available coverage in the event of a given occurrence.

*later than six years after the date of discovery of such breach or violation.*

29 U.S.C. § 1113 (emphasis supplied). As plaintiffs' claim is predicated on Gill's alleged fraud, then their claim was required to have been brought within six years after "the date of discovery of such breach or violation." In the court's opinion, although defendants have asserted that plaintiffs' claim is time barred, neither has presented evidence to substantiate this position and therefore, plaintiffs' claim is not subject to dismissal at this time on the basis of an expired limitations period.

## HOME LIFE

 Plaintiffs contend that Home Life is liable to the same extent as Jackson Stone for Gill's alleged misrepresentations concerning Mr. Williams' coverage. There is no evidence, however, to establish a basis for recovery against Home Life for Jackson Stone's alleged breach of its fiduciary obligations. ERISA prescribes certain circumstances in which "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan," as follows:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105. None of these circumstances are present in the case at bar. Plaintiffs do not contend that any failure by Home Life to fulfill its fiduciary obligations under § 1104(a) enabled Jackson Stone to breach a fiduciary duty. And plaintiffs have

not alleged, nor have they undertaken to prove that Home Life had any knowledge of Gill's alleged statements to Mrs. Williams at or near the time they were made. Indeed, plaintiffs apparently agree that Home Life knew nothing of any conversations between Gill and Mrs. Williams until after this suit was filed. Consequently, Home Life can have no liability for any breach by Jackson Stone of its fiduciary duty and the claims against Home Life will be dismissed.

## CONCLUSION

Based on the foregoing, it is ordered that defendant Home Life's motion for summary judgment is granted. It is further ordered that the motion of defendant Jackson Stone for summary judgment is denied.[18]

SO ORDERED.

---

**18.** The court would note before closing that the plaintiffs in this cause are still proceeding on the same *pro se* complaint they originally filed. *See supra* n. 2. Plaintiffs are hereby directed to file an amended complaint within ten days of the entry hereof clarifying the nature of their claims and the basis or bases upon which relief is sought. The court considers that all parties herein would agree that the original pleading is certainly inartful, and that it does not accurately reflect the nature of plaintiffs' true complaint, and did not do so even when filed.